IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. CR-04-94-C |
| ) | |
| SEAN MICHAEL GILLESPIE, ) | |
| ) | |
| Defendant. ) | |

FILED IN OPEN COURT

4-26-05

Robert D. Dennis, Clerk

By ____ RM ____
DEPUTY

**DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL
AND BRIEF IN SUPPORT**

Sean Michael Gillespie, by and through his attorney, Paul Antonio Lacy, moves the Court pursuant to Rule 29(a) of the FEDERAL RULES OF CRIMINAL PROCEDURE for judgments of acquittal on the grounds that the evidence is insufficient to sustain convictions on Counts 1 and 2. Mr. Gillespie contends the government has failed to prove "used in interstate commerce" and "in activities affecting interstate commerce" elements. Title 18, United States Code, § 924(c)(1)(A) and Title 18, United States Code, § 844(i).

Mr. Gillespie is charged under federal criminal statutes with using a Molotov cocktail to damage the Temple B'nai Israel in Oklahoma City Oklahoma. The purported federal nexus is the allegation that the building is used in interstate commerce and in activities affecting interstate commerce.

Viewing the evidence and the reasonable inferences therefrom in the light most favorable to the government, the inquiry of this Court is whether a reasonable jury could find defendant guilty beyond a reasonable doubt. The standard to be applied in assessing the

sufficiency of the evidence is whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Troutman*, 814 F.2d 1428 (10th Cir. 1987); *United States v. Drumright*, 534 F.2d 1383 (10th Cir. 1976). Mr. Gillespie submits the evidence is insufficient to support a conviction on Counts 1 and 2 of the Indictment.

## ARGUMENT

Two Supreme Court cases, *Jones v. United States*, 529 U.S. 848 (2000), and *United States v. Morrison*, 529 U.S. 598 (2000), taken together with earlier Supreme Court precedent, *United States v. Lopez*, 514 U.S. 549 (1995), show there is no interstate nexus and, thus, no federal jurisdiction.

The Supreme Court has signaled its growing discomfort with the expansion of federal criminal statutes into the province of what has traditionally been state police power. The discomfort began with *Lopez* and culminated with *Morrison* and *Jones.*

In *Lopez*, the defendant challenged his conviction under the Gun-Free School Zones Act, 18 U.S.C. § 922(q). That section makes it unlawful for any individual knowingly to possess a firearm at a place that individual knows or has reasonable cause to believe is a school zone. *Lopez*, 514 U.S. at 551. The defendant contended § 922(q) exceeded Congress's power to legislate under the Commerce Clause. *Id.* at 552. The Court agreed and ruled the statute unconstitutional.

The *Lopez* Court's analysis began by setting out three broad categories of activity that Congress may regulate under its commerce power: (1) "the use of the channels of interstate commerce"; (2) instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities"; and (3) "activities having a substantial relation to interstate commerce." *Id.* at 558-59.

Looking at § 922(q) in light of these three categories, the Court quickly and summarily disposed of the first two categories as the source of the statute's jurisdiction. 514 U.S. at 559. The first category was unavailing because § 922(q) was not a regulation of the channels of interstate commerce nor an attempt to prohibit the interstate transportation of a commodity through the channels of commerce. The second category was inapposite because § 922(q) could not be "justified as a regulation by which Congress has sought to protect an instrumentality of interstate commerce or a thing in interstate commerce." *Id.* The conclusion, from the first stage of the Court's analysis was that § 922(q) could pass constitutional muster only if the third category applied and the statute qualified as a regulation of an activity that substantially affects interstate commerce. *Id.*

Before determining whether § 922(q) could be justified under the third category, the *Lopez* Court addressed the criterion by which an activity falls within the third category. The Court noted that prior case law had not been clear whether an activity must merely "affect" or must "substantially affect" interstate commerce. *Id.* The Court concluded that "the proper

test requires an analysis of whether the regulated activity 'substantially affects' interstate commerce." *Id.*

The *Lopez* Court then considered and rejected four ways in which a statute such as § 922(q) might be deemed to regulate activity substantially affecting interstate commerce. First, it might be "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." 514 U.S. at 561. Noting § 922(q) is a criminal statute that, by its terms, has nothing to do with any sort of economic activity, the Court eschewed the notion that § 922(q) is a regulation of activity tied to a commercial transaction which, viewed in the aggregate, substantially affects interstate commerce. *Id.*

Second, the Court noted § 922(q) has no jurisdictional element that would ensure, on a case-by-case basis, that the firearm possession in question affects interstate commerce. *Id.* The Court contrasted § 922(q) with former 18 U.S.C. § 1202(a), the predecessor to § 922(g). Section 1202(a) criminalizes, *inter alia,* a felon's possession of a firearm "in commerce or affecting commerce." The *Lopez* Court noted that its earlier decision in *United States v. Bass*, 404 U.S. 336, 92 S.Ct. 515 (1971), permitted § 1202(a) to pass constitutional muster with regard to criminalizing possession only if there is an additional showing of a nexus between the firearm and interstate commerce. Because § 922(q) has no express jurisdictional element, it cannot be construed constitutionally in the way the *Bass* Court construed § 1202(a). *Id.* at 562.

4

Third, the Court turned to any legislative findings by Congress that might support the conclusion of substantial effect on interstate commerce. *Id.* at 563. With regard to § 922(q), however, the government conceded that no such legislative findings were made. Nevertheless, the Court stated that, generally, any legislative findings with regard to effect on interstate commerce are to be weighed into the Court's independent evaluation of a statute's constitutionality. 514 U.S. at 563. The Court also stated that although no such formal findings by Congress are required, such findings would help the Court evaluate "the legislative judgment" with respect to interstate nexus. *Id.*

Finally, the Court rejected a set of arguments in defense of § 922(q) to the effect that, implicit in the passage of that statute, were Congressional findings that guns near schools have the requisite effect on interstate commerce when viewed in the aggregate. *Id.* The government made the argument in various ways: (1) guns lead to violent crime which in turn leads to economic costs that are spread throughout the population; (2) guns lead to violent crime which in turn reduces people's desire to travel to certain areas within the country perceived as unsafe; and (3) guns near schools threaten the educational process and thereby threaten national productivity. *Id.* at 563-64.

The Court found that the government's contentions prove too much. Were it to accept such arguments, the Court would be "hard pressed to posit any activity by an individual that Congress is without power to regulate." *Id.* at 565. The Court refused to broaden the

commerce power so as to cede to Congress the general police power our system of federalism allotted to the States:

> To uphold the Government's contentions here, we would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States.

514 U.S. at 567; *see also Id.* at 602 (J. Thomas, concurring) ("If we wish to be true to a Constitution that does not cede a police power to the Federal Government, our Commerce Clause's boundaries simply cannot be defined as being commensurate with the national needs .... Such a formulation of federal power is not a test at all: It is a blank check.") (citations omitted).

In *Morrison*, the Court continued and expanded *Lopez's* limiting approach to Congress's use of the Commerce Clause as a basis for federal jurisdiction over intrastate violent activity. The *Morrison* Court struck down a portion of the Violence Against Women Act, 42 U.S.C. § 13981, because the activity being regulated, gender-motivated violence, was deemed not an activity that substantially affects interstate commerce.

Heeding the threefold categorical framework set out in *Lopez*, the Court began by noting that of the three categories of activities subject to regulation under the Commerce Clause, only the third category is relevant to a statute regulating gender-motivated violence. *Morrison*, 529 U.S. 598 (2000). Accordingly, the Court inquired whether such violence has a substantial affect on interstate commerce.

The *Morrison* Court considered four types of showings of the requisite Commerce Clause effects: whether the activity in question was economic, whether the statute at issue contained a jurisdictional element, any legislative findings of interstate nexus, and whether there are other arguments (including "implicit" legislative findings) establishing that the activity in question may have the requisite effect on interstate commerce. *Id.* at 609-613.

As in *Lopez*, the Court quickly disposed of the first and second considerations: gender-motivated crimes of violence "are not, in any sense of the phrase, economic activity," *id.* at 613; and the statute in question contained no jurisdictional element. *Id.* at 612-614. Even so, the Court's language in discussing the presence or absence of a jurisdictional element is instructive: "such a jurisdictional element would lend support to the argument" that a statute has a requisite interstate nexus. *Id.* at 613-614.

With regard to the third consideration, and unlike the statute reviewed in *Lopez*, however, the statute at issue in *Morrison* came with "numerous findings" by Congress. *Id.* at 614. The *Morrison* Court, however, deemed the Congressional findings behind § 13981 insufficient to establish interstate nexus:

> But the existence of congressional findings is not sufficient, by itself, to sustain the constitutionality of Commerce Clause legislation. As we stated in Lopez, "'[S]imply because Congress may conclude that a particular activity substantially affects interstate commerce does not necessarily make it so.'"

120 S.Ct. at 614 (citations omitted). The *Morrison* Court noted first that Congress's findings relied heavily on a "method of reasoning" already rejected in *Lopez*, namely, the set of government arguments concerning national productivity (*e.g.*, the activity affects commerce

by deterring travel, business interactions, and resulting in costs such as medical costs then imposed on the greater population). *Id* at 614.

The Court then found, as it did in *Lopez*, that accepting such a method of reasoning would "completely obliterate the Constitution's distinction between national and local authority:"

> The reasoning that petitioners advance seeks to follow the but-for causal chain from the initial occurrence of violent crime (the suppression of which has always been the prime object of the States' police power) to every attenuated effect upon interstate commerce. If accepted, petitioners' reason would allow Congress to regulate any crime as long as the nationwide, aggregated impact of that crime has substantial effects on employment, production, transit, or consumption. **Indeed, if Congress may regulate gender-motivated violence, it would be able to regulate murder or any other type of violence since gender-motivated violence, as a subset of all violent crime, is certain to have lesser economic impacts than the larger class of which it is a part.**

*Id.* (emphasis added). The Court further noted that the same faulty reasoning would lead to permitting Congress to regulate such traditional areas of state regulation as family law.

The *Morrison* Court concluded its analysis by definitively eschewing an "aggregate effects" methodology:

> We accordingly reject the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce. The Constitution requires a distinction between what is truly national and what is truly local. . . . In recognizing this fact we preserve one of the few principles that has been consistent since the Clause was adopted. The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States.

*Id.* at 618.

The Supreme Court applied the principles of *Lopez* and *Morrison* once again in *Jones*. At issue in *Jones* was the constitutionality of the federal arson statute, 18 U.S.C. § 844(i), when applied to private property not used for any commercial venture. The statute at issue makes it a federal crime to "maliciously damage[] or destroy[] . . . any building . . . used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce." *Jones*, 529 U.S. 848, 120 S.Ct. 1904, 1907 (2000). The defendant contended that the statute, when applied to the arson of a private residence, exceeded Congress's authority under the Commerce Clause. *Id.* at 1908. The *Jones* Court posed two questions at the beginning of its inquiry: (1) should the statute be construed not to reach owner-occupied private dwellings; and (2) if the statute is construed to reach private owner-occupied residences, is it constitutional under the Commerce Clause. *Id.* at 1908-1909.

Heeding its previous decision in *Lopez* as well as "the interpretive rule that constitutionally doubtful constructions should be avoided," answered the first question in the affirmative and thereby avoided the second question. *Id.* at 1908. In reaching its result, the Court rejected the government's reliance on the "breadth" of the term "affecting commerce" contained in § 844(i). *Id.* at 1909. Rather, the Court focused on the statutory phrase "used in" which qualifies the activity affecting commerce. The Court reasoned that to give the term "used in" full effect, its inquiry must first ascertain the function of the building at issue and then determine whether that function affected interstate commerce. *Id.* at 1910 (citing *United*

*States v. Ryan*, 9 F.3d 660, 675 (8th Cir. 1993) (Arnold, C.J., concurring in part and dissenting in part).

The *Jones* Court then considered the government's argument that the building at issue was constantly used in at least three ways affecting commerce. The government contended that the building was used (1) as collateral to obtain a mortgage and in turn as security by the lender on that loan, (2) to obtain a casualty insurance policy from an out-of-state insurer, and (3) to receive natural gas from out-of-state sources. 120 S.Ct. at 1910. The Court rejected the government's argument, reasoning that "use" means "active employment" and the purported "uses" of the building tendered by the government were not in the "common perception" seen as "activities" (e.g., receiving natural gas is not an "activity") and certainly were not "uses" with regard to "any trade or business." *Id.* And once again, as in the *Lopez* decision, the Court reasoned by *reductio ad absurdum* that were it to adopt the government's expansive interpretation of the statute, "hardly a building in the land would fall outside the federal statute's domain." *Id.* at 1911.

The *Jones* Court also made note of the distinction between the statutory terms "in commerce" and "affecting commerce." According to an earlier case construing the federal arson statute, *Russell v. United States*, 471 U.S. 858 (1985), when the latter term is used in a statute, and unqualified, such use evidences Congress's intent to invoke its full authority under the Commerce Clause. *Id.* The former term applies only to activities "in commerce." *Id.* But considered under Congress's exercise of its most expansive Commerce Clause

power, rental of a residence is an activity affecting commerce whereas private use of a residence is not. *Id.*

Notably, in a concurrence joined by Justice Thomas, Justice Stevens spoke of his discomfort with a statute that effectively displaces a state statute. *Jones*, 120 S.Ct. at 1912 (Stevens, J., concurring). Justice Stevens stated he was reluctant "to believe Congress intended to authorize federal intervention in local law enforcement in a marginal case such as this. The fact that petitioner received a sentence of 35 years in prison when the maximum penalty for the comparable state offense was only ten years, illustrates how a criminal law like this may effectively displace a policy choice made by the State." *Id.*

The text - "used in interstate commerce . . . or in any activity affecting interstate . . . commerce" - "suggests two methods by which a building can fall within section 844(i)'s interstate commerce element: the commercial function of the property could directly inject it into the stream of interstate . . . commerce and/or the building's functions could cause it to be used in an activity affecting interstate commerce." *United States v. Rea*, 300 F.3d 952, 961 (8th Cir. 2002). For a building to be used in activities affecting interstate commerce, it must be "active[ly] employ[ed] for commercial purposes."

Subsequent to the decision in *Jones*, the circuits have re-examined Section 844(i)'s jurisdictional element and have found it requires a greater connection to commerce than what most churches have.

In *United States v. Davis*, 394 F.3d 182, (2005), the Third Circuit held that evidence that a church building housed a school, that the school bought supplies from out of state, that it graduated students who attended out-of state colleges, and that the congregation made financial contributions to out-of-state and overseas missions was not enough to bring the church's buildings within the protection of the Section 844(i). None of the connections to commerce demonstrated that the building satisfied the statute's jurisdictional element, which requires that a burned building be "used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce."

In *United States v. Lamont*, 330 F.3d 1249 (2003), the Ninth Circuit held that a church's membership in an interstate organization, out-of-state members, interstate transfers of funds, and other interstate activities did not establish the connection with interstate commerce required to bring a burned church building within the scope of Section 844(i).

In *United States v. Tush*, 287 F.3d 1294 (2002), *cert. denied*, 537 U.S. 936 (2002), the Tenth Circuit held "[i]n resolving whether a sufficient interstate commerce nexus exists, the proper inquiry'is into the function of the building itself, and then a determination of whether that function affects interstate commerce." *Citing Jones*, 529 U.S. at 854 (quotation marks and citation omitted). The Tenth Circuit noted it had held previously that *Jones* did not foreclose § 844(i) prosecutions for arson of a church when the defendant made an unqualified stipulation the church was used in an activity affecting interstate commerce.

Citing *United States v. Grassie*, 237 F.3d 1199, 1207-08 (10th Cir.), *cert. denied*, 533 U.S. 960 (2001). Mr. Gillespie has not stipulated to this element.

In *United States v. Carr*, 271 F.3d 172 (2001), the Fourth Circuit observed that the use of a building as a church does not alone qualify it as being used in interstate commerce. *Id.* at 179.

In *United States v. Odom*, 252 F.3d 1289 (2001), *cert. denied* 535 U.S. 1058 (2002), the Eleventh Circuit relied on *Jones* to overturn convictions under Section 844(i) that were based on evidence that a church received out-of-state donations, used out-of state Bibles and prayer books, and indirectly contributed to an out-of-state church organization through its membership in an in-state church organization.

Under the circumstances of this case, no reasonable jury could find that the government proved counts 1 and 2 of the indictment. Mr. Gillespie urges that the government cannot distinguish the Temple B'nai Israel from the from the school in *Lopez* or the private home in *Jones*. Mr. Gillespie requests this Court grant judgments of acquittal on Counts 1 and 2 pursuant Rule 29 of the FEDERAL RULES OF CRIMINAL PROCEDURE. A ruling to the contrary would be inconsistent with the Supreme Court's interpretation of the Commerce Clause.

Respectfully submitted,

_____
PAUL ANTONIO LACY
ASSISTANT FEDERAL PUBLIC DEFENDER
Bar Number: 5156
Attorney for Defendant

OFFICE OF THE FEDERAL PUBLIC DEFENDER
215 Dean A. McGee, Suite 109
Oklahoma City, Oklahoma 73102
Telephone: 405-609-5944
Facsimile: 405-609-5932
E-Mail: Tony.Lacy@FD.org

_____
SUSAN M. OTTO
FEDERAL PUBLIC DEFENDER
Bar Number: 6818
Attorney for Defendant
OFFICE OF THE FEDERAL PUBLIC DEFENDER
215 Dean A. McGee, Suite 109
Oklahoma City, Oklahoma 73102
Telephone: 405-609-5930
Facsimile: 405-609-5932
E-Mail: Susan.Otto@FD.org

## CERTIFICATE OF SERVICE

__X__   I hereby certify that on April 26, 2005 I hand delivered a true and correct copy of this Motion to:

Jerome Holmes and Scott Palk
Assistant United States Attorneys

_____
PAUL ANTONIO LACY